IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01384-MEH-KMT

JAMES E. BERWICK,
AFFILIATES IN ORAL AND MAXILLOFACIAL SURGERY, P.C.,

      Plaintiffs,

v.

HARTFORD FIRE INSURANCE COMPANY, INC.,

      Defendant.

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**Michael E. Hegarty, United States Magistrate Judge.**

      The parties in this lawsuit have filed opposing motions for partial summary judgment. *See* Plaintiffs' Motion for Partial Summary Judgment Re: Business Income for Period from 1/24/2009 to 4/23/2009  [filed July 6, 2012; docket #97]; Defendant's Motion for Partial Summary Judgment and Brief in Support of the Motion (Oral Argument Requested) [filed July 6, 2012; docket #100]. The motions are fully briefed, and I have determined that, given the extensive time that I have spent with the parties in open court resolving various motions, oral argument will not materially assist. For the reasons that follow, I **deny** the motions.

## I.  BACKGROUND

      Plaintiffs James E. Berwick ("Berwick") and Affiliates in Oral and Maxillofacial Surgery, P.C. ("Affiliates") took out an insurance policy with Defendant The Hartford Fire Insurance Company ("Hartford"), Policy No. 65 SBA PT3146 DX ("the "Policy"). On or about May 8, 2008, Plaintiffs' business suffered a fire at 3100 North Academy Boulevard, Colorado Springs, Colorado 80917 (the "Premises"). As a result of the fire, the Premises was rendered uninhabitable; however,

after clean up and repair, Berwick and Affiliates were able to reoccupy the Premises on or about January 23, 2009.

The Policy, *inter alia*, includes coverage for loss of business income and extra expense. The limits of insurance for the business income and extra expense coverage is described as "12 months actual loss sustained." On June 30, 2010, Berwick and Affiliates filed a sworn proof of loss with the Defendant which included a loss of income in the amount of $461,912.00; this proof of loss was based on an analysis performed by Certified Public Accountant Roberta Jackson. Plaintiffs allege that Defendant The Hartford has failed to pay the Plaintiffs' claim for loss of business income and, in so doing, the Defendant has breached its insurance contract. Plaintiffs also allege Defendant violated the Unfair Claims Settlement Practices subdivision of the Unfair Methods of Competition and Unfair Deceptive Acts or Practices section of the Colorado Insurance Code, C.R.S. § 10-3-1104. Finally, Plaintiffs contend the Defendant acted unreasonably in failing to pay Plaintiffs' claim for loss of business income. Defendant denies Plaintiffs' allegations and contends it has paid over $70,000.00 in business income benefits to Plaintiffs. Defendant disputes the accounting or other methodologies on which Plaintiffs claim to have relied in asserting a claim for over $400,000.00 in benefits allegedly traceable to the subject fire loss.

## II.  DISCUSSION

### A.    Legal Standards for Summary Judgment

Summary judgment serves the purpose of testing whether a trial is required. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the

governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). However, the non-moving party has the burden of showing that there are issues of material fact to be determined. *Id.* at 324.

That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

**B.     Interpretation of Insurance Contracts**

This is a diversity case. Therefore, the Court applies Colorado law. *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1108-09 (10th Cir. 2002). Insurance policies are subject to principles of contract interpretation. *Bailey v. Lincoln Gen. Ins. Co.,* 255 P.3d 1039, 1050 (Colo. 2011).

Although the ultimate aim is to effectuate the contracting parties' intentions, *id.*, the Colorado Supreme Court has declared that insurance policies are not ordinary, bilateral contracts, *id.* at 1049, and insurance policies "'must be given effect according to the plain and *ordinary* meaning' of their terms." *Id.* at 1050-51 (citation omitted) (emphasis in original). This is to ensure that the reasonable expectations of an ordinary person who purchased a policy will be fulfilled. *Id.* at 1051. "If, based on how an ordinary, objectively reasonable insured would read the whole policy, the question of whether certain coverage exists is 'susceptible to more than one reasonable interpretation,' *Cary v. United of Omaha Life Ins. Co.,* 108 P.3d 288, 290 (Colo. 2005), then the coverage provisions are ambiguous, to be construed against the insurer as the drafter of the policy." *Bailey*, 255 P.3d at 1051. However, although Colorado courts subject an insurance contract to scrutiny for provisions that unduly compromise an insured's interests and may be, therefore, rendered unenforceable, courts are not to re-write clear and unambiguous provisions. *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 820 (Colo. 2002).

**C.   Analysis of the Parties' Respective Motions**

    **1.   PLAINTIFFS' BREACH OF CONTRACT CLAIM CONCERNING EXTENDED BUSINESS LOSS COVERAGE**

Both parties move for summary judgment concerning their respective positions on the issue of Defendant's alleged breach of insurance contract for failure to pay extended business loss benefits. Plaintiffs' motion relies primarily on their interpretation of the Policy as including (1) extended business income loss benefits, (2) up to 90 days after the Premises were re-occupied following restoration,[1] (3) for decreased operations. In relevant part, the Policy provided for

---

[1] It is undisputed that Plaintiffs purchased a "super stretch" endorsement under which, if applicable, business income loss benefits could be paid up to 90 days after Plaintiffs re-occupied the Premises.

reimbursement of lost business income during the restoration period ("Business Income coverage") and, in certain circumstances, beyond that period ("Extended Income coverage"). The extended coverage, which is at issue in this case, applied to income lost because of the fire, beginning (1) the date Business Income coverage ends, and ending on (2) "the earlier of: (I) [t]he date [the Plaintiffs] could restore [their] 'operations' with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or (ii) 30 consecutive days after the (re-occupancy) date."[2] The Policy further states:

> Loss of Business Income must be caused by direct physical loss or physical damage at the "scheduled premises" caused by or resulting from a Covered Cause of Loss.

It is undisputed that Defendant did not reimburse Plaintiffs for alleged business income loss occurring after the re-occupancy date, January 23, 2009.

Defendant contends that Plaintiffs did not qualify for extended coverage because, as of January 23, 2009, Plaintiffs' operations were fully functional, and the same volume and nature of work could be physically performed on that date as before the fire. Defendants argue that any reduction in business after the date the office was once again capable of full operation should be categorized as "market forces" damages arising from the loss, which are not compensable. On the other hand, Plaintiffs contend that losses extending beyond that date were

> the result of the fire directly. Patients and referring dentists did not know that the Plaintiffs had reopened at their original location for a period of time. Advertising indicated incorrect information. Patients again did not know how to find the Plaintiffs' location for a period of time. These were all direct consequences of the fire itself, not some unspecified and esoteric market consequence . . . .

Reply, at 4.

---

[2]The "super stretch" endorsement extended this latter period an additional 60 days, if (ii) applied.

Plaintiffs argue that the extended coverage provision, which appears to presume *some* starting point and an ending point, is illusory if given Defendant's interpretation (*i.e.*, that the provision is inapplicable if Plaintiffs' offices were physically capable of full operations on the date of re-occupancy). Defendant argues Plaintiff Dr. Berwick has admitted that as of January 23, 2009, the operations at his restored premises were "on a physical basis, [as if] the fire had not occurred." Berwick Depo. at 161:4-7. Thus, Defendant contends, the extended coverage provision did not kick in, since January 23, 2009 was, as a matter of law, the date the Plaintiffs could have restored their operations with reasonable speed.

The critical consideration in this analysis is the meaning of the term "restore their operations." Defendant relies on a pure mechanical definition, that the physical plant was back to its original pre-fire state. It is undisputed that this occurred on January 23, 2009. Plaintiffs argue that restoration of operations means much more, including a reasonable time in which to return to a volume of operation resembling the pre-fire state. From Plaintiffs' viewpoint, while the doors were officially re-opened on January 23, 2009, normal business operations did not resume until sometime later, when referring dentists and potential patients became aware of Plaintiffs' restored operations. Until then, according to the Plaintiffs, the business continued to suffer losses caused by the fire, *i.e.*, but for the fire, the business would have been running at a higher volume and would have seen more income. Plaintiffs contend that the extended coverage was designed to cover the reduction in business for a reasonable period after re-occupancy.

Defendant relies primarily on *Brand Mgmt., Inc. v. Maryland Cas. Co.*, No. 05-cv-02293, 2007 WL 1772063 (D. Colo. June 18, 2007) (Blackburn, J.), in which a business that was shut down for 15 days in order to be sanitized from listeria contamination contended that, during the shutdown, their major customer stopped buying from them and would not change its mind even after the

6

business was declared clean. I disagree that this decision is helpful. In that case, Judge Blackburn dealt with insurance coverage that required the alleged business income loss to be causally linked to *both* "necessary suspension of operations" and also that it be sustained during the "period of restoration." *Id.* at *2 ("Only when both preconditions are satisfied is coverage provided."). Such is not the case here, since the alleged uncompensated business losses occurred neither when there was a suspension of operations nor during the period of restoration. The insurance coverage at issue here is post-restoration period. In *Brand Mgmt.*, Judge Blackburn simply determined that if a business is capable of full operations, it is no longer in a period of restoration nor is it under a necessary suspension of operations. There was no issue in that opinion concerning post-restoration benefits. Moreover, Judge Blackburn found that the Plaintiff had submitted insufficient record evidence of loss of the largest customer during the period of restoration. I do not know what Judge Blackburn would have decided had the quality of evidence been different.

Moreover, Defendant asserts that *Brand Mgmt.* stands for the proposition that business-interruption insurance "does not provide coverage for the subsequent market consequences of the temporary cessation of business." Defendant's Motion for Partial Summary Judgment, at 29-30 (quoting *Brand Mgmt*., at *3. What Judge Blackburn actually said was as follows: "The phrase 'necessary suspension of operations,' although not defined in the policy, is generally understood to connote a total cessation of business activity. . . . Thus, once the insured is able to resume operations, the business interruption clause does not provide coverage for the subsequent market consequences of the temporary cessation of business." *Brand Mgmt.*, at *3. For purposes of this motion, the parties in the present case do not dispute the business income coverage aspect of Plaintiffs' Policy (other than the calculations of the losses for that period), which equates to the total cessation of Plaintiffs' business at the Premises from the date of the fire to January 23, 2009, but

7

rather they dispute the extended coverage provision.

The definition of "operations" in the insurance contract "means your business activities occurring at the 'scheduled premises.'" If, on January 23, 2009, Plaintiffs' business had its office ready for customers, its employees present, all its necessary equipment in place, and in fact opened its doors but had no customers (a fact subject to some dispute), had it "restored" its "operations"? Remember, the Policy provided for benefits during a period of restoration. Necessarily, the period of restoration ended when Plaintiffs' business was, once again, fully operational. I am sympathetic with Plaintiffs' argument that, therefore, extended business income coverage potentially provides benefits after the moment the insured's business becomes fully operational, or else it has no meaning at all. What I do not have before me is sufficient evidence to determine what happened during the weeks leading up to January 23, 2009. Were Plaintiffs given sufficient advance notice that this would be the end of the restoration period such that they, using *reasonable speed*, *could* have *restored* normal operations on January 23, 2009 by sending out flyers, making phone calls, engaging in advertising, and otherwise letting the world know that they were back in business in the weeks or days leading up to the re-opening (italicized terms being those used in the contract)?[3] Further, under the Policy's definition of "Loss of Business Income," was there a discernible (and provable) diminution in operations "caused by or resulting from" the fire?

---

[3]The terms "could restore" and "reasonable speed" connote some subjectivity. Reasonableness is ordinarily a question of fact for the jury. *Schuessler v. Wolter*, __ P.3d __, 2012 WL 1881002, at *7 (Colo. App. May 24, 2012); *URS Group, Inc. v. Tetra Tech FW, Inc.*, 181 P.3d 380, 389 (Colo. App. 2008). *See also STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC*, 648 F.3d 68, 81 (2d Cir. 2011) ("reasonable" is inherently imprecise and involves balancing factors); *City of New York v. U.S. E. P. A.*, 543 F. Supp. 1084, 1089 (S.D.N.Y. 1981) ("The term 'reasonable' inherently connotes a weighing of all the relevant circumstances."); *Putnam Park Associates v. Fahnestock and Co., Inc.*, 73 Conn. App. 1, 11, 807 A.2d 991, 997-98 (Conn. App. 2002) ("[T]he term 'reasonable time' for performance of a contract is ordinarily a question of fact for the trier of fact . . . .").

Finally, the Policy requires Plaintiffs to use reasonable speed to restore operations. Plaintiffs are not contractors and presumably (although I do not have a record on this) did not themselves reconstruct the Premises. Thus, the Policy should not be interpreted as requiring Plaintiffs to use reasonable speed to actually *restore* the Premises, which is what occurred as of January 23, 2009 (for the speed in which the Premises were restored was likely out of Plaintiffs' control), but to restore *operations*, which may or may not have occurred by January 23, 2009. Restoring the Premises and restoring operations have to be interpreted differently.

I believe these are jury questions, and for that reason, on the issue of extended coverage (which is a maximum of 90 days after January 23, 2009), summary judgment for either side is not appropriate.

### 2. CROSS MOTIONS ON BAD FAITH CLAIM RE EXTENDED BUSINESS INCOME

Plaintiffs contend that Defendant engaged in bad faith when, in the context of post-fire communications, Defendant advised Plaintiffs of the business interruption coverages but not of the extended (post-restoration) coverage. Moreover, Plaintiffs contend that Defendant engaged in bad faith when it did not assess any post-restoration losses, did not adjust such a claim, and did not pay any post-restoration benefits.

A claim of bad faith alleges that an insurance company refused to make or delayed payments owed to its insured under a first-party policy such as that presented here. *Goodson v. Am. Standard Ins. Co.,* 89 P.3d 409, 414 (Colo.2004). For an insured to prevail on a bad faith breach of contract claim against the insurer, the insured must establish that the insurer acted unreasonably and with knowledge of or reckless disregard of its unreasonableness. *Dale v. Guar. Nat'l Ins. Co.,* 948 P.2d 545, 551 (Colo. 1997).

I do not believe that summary judgment is appropriate for Plaintiffs on this claim. First, as noted by the *Schuessler* case cited above (and many other Colorado appellate decisions), in a first-party bad faith breach of insurance contract case, the reasonableness of the insurer's actions is ordinarily a question of fact for the jury, unless there are no genuine issues of fact and reasonableness is not genuinely disputed.

Second, although I find a remarkable dearth of citations to any record evidence in their opposition to Plaintiffs' motion for partial summary judgment,[4] I find that the reasonableness of Defendant's actions regarding disclosure (or nondisclosure) of coverage to be nonetheless sufficiently disputed to deny Plaintiffs summary judgment on this point. Plaintiffs did not support this factual allegation (undisputed fact #14) with any citation to the record. What Plaintiffs did provide is a letter from Defendant in which the author, claim representative James Duckworth, explained the coverage for loss of business income during the period of restoration. This does not establish that Duckworth did not at some other time explain extended coverage. Conversely, in support of their allegation that Duckworth in fact "provided written disclosure of all available coverages," Defendant cites to the deposition testimony of their representative Boyd Beadles; he testified that he believed Defendant disclosed to the Plaintiffs -- after the loss occurred -- the existence of extended business loss coverages. When asked what the source of his understanding

---

[4]In response to Plaintiffs' 31 separately numbered undisputed facts, Defendant cites to evidence only as to numbers 14, 27, 28, and 29. For many of Plaintiffs' undisputed facts, Defendant merely states in conclusory fashion that Plaintiffs have not submitted sufficient evidence to establish the fact. "A party asserting that a fact cannot be or is genuinely disputed *must* support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) *showing* that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c) (emphasis added).

was, Beadles stated that he saw it in Duckworth's deposition testimony. This is inadmissible hearsay. Both parties failed to meet the standards of Rule 56 regarding this material fact, but Plaintiffs' failure is fatal to their request for summary judgment on the issue of explanation of coverages.

Concerning the failure to pay extended business loss benefits, again I find that the reasonableness of Defendant's actions are a jury question. Defendant has pointed to evidence in the record showing that Plaintiffs' office was capable of operating at full capacity on January 23, 2009. Whether Plaintiffs could have restored their operations as of that date with reasonable speed is a jury question. Since Plaintiffs may not even have qualified for any payments for losses postdating January 23, 2009, I cannot say as a matter of law that Defendant's admitted failure to pay such benefits was bad faith.

Defendant also moves for summary judgment on Plaintiffs' bad faith claim. Defendant characterizes Plaintiffs' bad faith claim as relying either on unreasonable delay or undervaluation. Plaintiffs submit that their claim is broader, and encompasses failure to assess Plaintiffs' damages in good faith and failure to communicate to Plaintiffs the extent of coverage available under the Policy. Colorado courts have recognized that a bad faith claim is not limited to the insurance company's decision to grant or deny a claim but can also include an insurer's unreasonable refusal to investigate a claim and to gather facts relevant to the claim. *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274 n.20 (Colo. 1985). "All aspects of payment, including the adjustment of a claim, that is, the '[determination] of the amount that an insurer will pay an insured to cover a loss,' *see Blacks Law Dictionary* 48 (9th ed.2009), fall within an insurer's good faith duty to its insured." *Dunn v. American Family Ins.*, 251 P.3d 1232, 1235 (Colo. App. 2010). Indeed, "for any actions pertaining to the investigation and handling of a claim, an insurer acting unreasonably, and with knowledge

11

or reckless disregard, may be held liable in tort for the breach of the covenant of good faith and fair dealing." *Id.* The *Dunn* case dealt specifically with the insurer's duty to communicate with the insured regarding coverage after a claim is filed, holding that breach of such a duty can be the basis for a bad faith claim.

One of Defendant's principal arguments is that none of Plaintiffs' experts express the opinion that Defendant's approach in evaluating the business loss claim was without reasonable basis. However, expert testimony is not necessary to establish the standard of care in the insurance industry to prove that the insurer breached its duty of good faith, *i.e.*, that the insurer acted unreasonably, if the standard is within the common knowledge and experience of ordinary persons. *American Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 344 (Colo. 2004). Here, I believe the standard of care (involving timeliness, proper assessment and evaluation, and proper communication) are sufficiently within the common knowledge and experience of ordinary persons as to not require expert testimony.

Defendant also argues that during the claim adjusting period, Plaintiffs provided loss numbers that they now have disavowed and that were artificially high. Defendant accurately describes how Plaintiffs and their experts have agreed that the proof of losses submitted by Plaintiffs were originally unreasonable. Defendant thus argues that their assessment of losses at $79,910 cannot, as a matter of law, be unreasonable. They further assert that some of the information needed to accurately adjust Plaintiffs' claim (*e.g.*, cash collection data) was not produced until well after this lawsuit was filed.

There are certain specific arguments Defendant makes with which I agree. For example, to the extent Plaintiffs are arguing that it was bad faith for Defendant to have "challenged Plaintiffs' pre-litigation demands for over $370,000 in business-interruption benefits ," Defendant's Motion

at 13, I will not permit this to be a basis for a jury verdict on bad faith. The same is true for any argument that Defendant "should not have challenged Plaintiffs' loss estimate provided in discovery in this action." *Id.*[5] As noted above, the issue of bad faith is usually one of fact for the jury. At this point in the proceedings, I am not convinced that no reasonable juror could find a lack of unreasonableness as to any possible aspect of Defendant's claim handling for which Colorado law would permit a bad faith claim to be asserted. I am not foreclosing the possibility that I may become so convinced after Plaintiffs' presentation of evidence at trial, or after all the evidence is in. But at this point I find it more efficient to deny summary judgment rather than "piece-meal" the issue, and to address at trial the specific allegations of bad faith, if any, that have enough of a factual basis to submit to a jury. Consistent with this ruling, to the extent I ultimately find that any claim for bad faith can be decided by the jury, the jury will be given detailed interrogatory questions as a precursor to any finding of bad faith. I will rely upon the parties to assist in the drafting of such instructions and jury verdict form.

### 3. PLAINTIFFS' BREACH OF CONTRACT CLAIM FOR SUPER STRETCH BENEFITS

Plaintiffs request summary judgment on the Defendant's obligation to pay loss of business income for 90 days after January 23, 2009, pursuant to the "super stretch" endorsement purchased by Plaintiffs. This endorsement substitutes 90 days for the 30-day period under the extended coverage provision discussed above. If summary judgment is not appropriate on whether any part of the 30-day extended coverage provision of the Policy was due and owing, the same is true for the

---

[5] By listing these two specific arguments I do not intend to convey the message that all other aspects of Plaintiffs' bad faith claim are valid. For example, Defendant may also be correct in its argument that the delay in receiving certain information from Plaintiffs bars a bad faith claim for delay. For brevity's sake, and in light of my decision to deny summary judgment for Defendant at this point, I do not intend to specifically analyze all the facets of the bad faith claim.

90-day super stretch endorsement. Plaintiffs also request that I enter summary judgment on the amount of business losses incurred during that post-January 23, 2009 period, since Plaintiffs submitted unrebutted evidence (a report by Kurt Kofford) on such amount. However, at trial Defendants will be permitted to impeach Kofford, and it will be up to the jury to determine the amount of damages, if any, to which Plaintiffs are entitled on this claim.

Defendant also requests summary judgment on this claim. As I have discussed herein, the record before me is insufficient to determine how quickly, using reasonable speed, Plaintiffs' operations should have recovered (when viewed in light of the economy as a whole which, as Defendant notes, was in an historic downturn at all relevant times concerning the loss, restoration period and extended coverage period). These appear to me to be quintessential jury questions. If, at the trial of this matter, Defendant establishes that no reasonable jury could possibly find that 90-days of benefits were necessary or proper, I will enter an appropriate order.

### 4.   CROSS MOTIONS ON BAD FAITH CLAIM RE SUPER STRETCH ENDORSEMENT

For the same reasons discussed above in connection with Plaintiffs' bad faith claim concerning extended business loss coverage, I deny summary judgment for Plaintiffs on the bad faith claim concerning the super stretch endorsement, both for the alleged claim that Defendant failed to advise Plaintiffs of such coverage, and for the actual denial of coverage. The same is true for Defendant's motion. Again, in the event the evidence is insufficient to go to the jury on this issue, I will enter judgment at the appropriate time during trial.

### III.  CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Partial Summary Judgment Re: Business Income for Period from 1/24/2009 to 4/23/2009  [filed July 6, 2012; docket #97], and Defendant's

Motion for Partial Summary Judgment and Brief in Support of the Motion (Oral Argument Requested) [filed July 6, 2012; docket #100], are **denied.**

Dated at Denver, Colorado, this 4th day of September, 2012.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge